# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE P3 HEALTH GROUP HOLDINGS, LLC | ) ) | Consol. C.A. No. 2021-0518-JTL |

# OPINION

Date Submitted: July 13, 2022
Date Decided: October 26, 2022

Bruce E. Jameson, Corinne Elise Amato, Eric J. Juray, Elizabeth Wang, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; Craig Carpenito, Richard H. Walker, Samuel C. Cortina, KING & SPALDING LLP, New York, New York; *Counsel for Hudson Vegas Investment SPV, LLC*.

William M. Lafferty, Kevin M. Coen, Ryan D. Stottmann, Sara Toscano, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Counsel for Jessica Puathasnanon and P3 Health Group Holdings, LLC*.

Kevin R. Shannon, Christopher N. Kelly, Daniel M. Rusk IV, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; William K. Kane, J, SHEPPARD MULLIN RICHTER & HAMPTON LLP, Chicago, Illinois; James C. Wald, SHEPPARD MULLIN RICHTER & HAMPTON LLP, Los Angeles, California; *Counsel for Chicago Pacific Founders Fund, L.P., CPF P3 Splitter, LLC, Greg Kazarian, Larry Leisure, Mary Tolan, and Sameer Mathur*.

Elena C. Norman, Paul J. Loughman, Lakshmi A. Muthu, Alberto E. Chávez, YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, Delaware; *Counsel for Sherif W. Abdou, Amir Bacchus, Gary Garrett, Lorie Glisson, Taylor Leavitt, and Tom Price*.

**LASTER, V.C.**

Chicago Pacific Founders Fund, L.P ("Chicago Pacific") is a private equity fund. Sameer Mathur is one of its principals. Before the transaction challenged in this litigation, P3 Health Group Holdings, LLC (the "Company" or "P3") was a privately held company controlled by Chicago Pacific. Mathur was part of the Chicago Pacific team that oversaw the fund's investment in the Company.

Hudson Vegas Investment SPV, LLC ("Hudson") was a minority investor in the Company. In this litigation, Hudson has challenged a transaction between the Company and a special purpose acquisition company, commonly known as a SPAC. In one of its claims, Hudson asserts that in his role as part of the Chicago Pacific team that engineered the de-SPAC merger, Mathur tortiously interfered with the contractual rights that Hudson enjoyed under the Company's limited liability company agreement. Mathur has moved to dismiss Hudson's claim on the merits. He also has moved for dismissal under Rule 12(b)(2) on the theory that the court cannot exercise personal jurisdiction over him. This decision addresses the latter motion.

A proper exercise of personal jurisdiction must clear two hurdles. First, there must be a valid means of serving the defendant with a summons. Second, the resulting exercise of jurisdiction must provide the defendant with the protections afforded by minimum standards of due process.

Section 18-109(a) of the Delaware Limited Liability Company Act (the "LLC Act") provides a mechanism for serving process on a manager of an LLC. Section 18-109(a) authorizes service on two types of managers. One type encompasses persons

whom the governing LLC agreement formally names as managers ("formal managers"). The other type encompasses persons who participated materially in the management of the limited liability company, regardless of whether the governing LLC agreement formally names them as managers ("acting managers").

Mathur was not a formal manager. Not only that, Mathur held no official role with the Company, such as an officer title or a position as an employee. Several decisions upholding the service of process on acting managers have involved officers or employees. But it is not necessary for the defendant to have an official role with the LLC. Section 18-109(a) only requires that the defendant have participated materially in the management of the LLC. At least two Delaware decisions have exercised jurisdiction under Section 18-109(a) over a passive, non-managing member that purported to act on behalf of the LLC, despite lacking any official role.

Outside the context of Section 18-109(a), when evaluating claims on the merits, Delaware decisions have recognized that a defendant who does not hold any position with an LLC can act as a de facto manager of the LLC. As developed in those cases, the concept of a de facto manager refers to a person who acts on behalf of the LLC, either generally or for the purpose of a specific transaction, by making decisions for or taking action on behalf of the LLC. The showing necessary to impose liability on a defendant as a de facto manager resembles the showing necessary to serve process on a defendant as an acting manager—which makes sense, because the two concepts work together to ensure that the Delaware courts can provide a forum for overseeing the behavior of individuals who make decisions for or take actions on behalf of a Delaware LLC.

2

There is no requirement that a defendant have any type of formal role with the LLC to qualify as either an acting manager or its common law equivalent, the de facto manger. The complaint alleges specific facts, bolstered by contemporaneous documents, which support a pleading-stage inference that Mathur qualifies as an acting manager for purposes of claims challenging the de-SPAC merger. Mathur made decisions on behalf of the Company, directed the Company's management to take action, instructed the Company's advisors to perform work without authorization from Company management, berated the Company's outside counsel for not running documents by him before sending them out, and enjoyed access to information that even formal managers of the Company did not have. Mathur therefore qualifies as an acting manager and can be served with process under Section 18-109 for purposes of claims that arise out of the actions he took and the decisions he made.

The exercise of personal jurisdiction over Mathur comports with minimum standards of due process. A chartering state has a strong interest in resolving disputes involving the internal affairs of the entities that it creates. An individual who chooses to become involved in the business and affairs of a Delaware entity must expect to be subject to suit in the courts of the chartering state for actions taken on the entity's behalf. Mathur is not being sued in some out-of-the-way or inconvenient jurisdiction disconnected from the matter in question. He is being sued in the courts of the state whose law created the entity at the center of the dispute.

The complaint accordingly supports the exercise of personal jurisdiction over Mathur. His motion under Rule 12(b)(2) is denied.

# I.     FACTUAL BACKGROUND

The facts are drawn from the operative complaint and the documents it incorporates by reference. At this stage of the proceedings, the complaint's allegations are assumed to be true, and the plaintiff receives the benefit of all reasonable inferences. When assessing jurisdiction, a court is not limited to the allegations of the complaint. The court can consider record evidence.[1]

## A.     The Company

Before the de-SPAC merger challenged in this litigation, the Company was a Delaware LLC that engaged in the business of population healthcare management. That concept involves providing administrative support to physicians and other healthcare providers so that patients receive more cost-effective healthcare. The Company's business plan involved acquiring healthcare practices to increase its patient enrollment. At the time of the events giving rise to this litigation, the Company operated in Nevada, Arizona, Florida, and Oregon.

Chicago Pacific is a private equity fund focused on the healthcare industry. Before the de-SPAC merger challenged in this litigation, the Company was one of Chicago Pacific's portfolio companies. The fund provided the initial capital for the Company and referred to itself as the Company's founding investor. Chicago Pacific enjoyed special

---

[1] Citations in the form "Ex. —" refer to documents attached to the complaint. Citations in the form "AC ¶ —" refer to allegations in the complaint. Citations in the form "PX __" refer to exhibits from Hudson's previous motion for a preliminary injunction.

4

governance rights under the Company's limited liability company agreement (the "LLC Agreement"), including the right to appoint members to the Company's board of managers (the "Board"). When the events giving rise to this litigation took place, Chicago Pacific had the right to appoint five of the eleven members of the Board. One fund principal—Mary Tolan—served as the Chair of the Board. Another fund principal—Gregory Kazarian—served as a member of the Board and as the Chief Strategic Officer of the Company.

Mathur is a principal of Chicago Pacific. There is no indication that he has ever held any official role with the Company, whether as a manager, officer, employee, or otherwise. Yet he has a history of taking action and making decisions on the Company's behalf. For example, when Hudson invested in the Company, it was Mathur who led the negotiations for the Company. *See* PXs 2–3. When it came time to seek Board approval for the investment, it was Mathur who circulated the proposed consent and explained the deal to the Board. PX 4. Mathur likewise took the lead on behalf of the Company when another investor acquired a member interest. *See* PX 6. And when the Covid-19 pandemic hit, it was Mathur who led the effort to determine whether the Company could qualify for a Paycheck Protection Program loan, including what changes to the LLC Agreement would be necessary to enable the Company to receive funds. *See* PX 7.

**B. The Company Explores Ways To Raise Capital**

In August 2020, the Company began exploring ways to raise capital by accessing the public markets. Dkt. 100 at 10. On September 1, various representatives of the Company, including several members of the Board, held a Zoom meeting to review the

5

Company's strategic alternatives. PX 8 at '152. Mathur was not a member of the Board. Even so, he received the materials for and participated in the Zoom meeting. *Id.*

One of the strategic alternatives was to combine the Company with another Chicago Pacific portfolio company known as MyCare. *Id.* at '169–81. The combined company then could access the public markets through a traditional initial public offering or through a de-SPAC merger. *See id.* at '180–81.

In November 2020, the Company engaged in discussions with Greg Wasson, the former CEO of Walgreens, about the possibility of merging with a SPAC that Wasson would sponsor through his family office. *See* PXs 10–12. On November 18, the Board held a meeting at which it discussed the possibility of a merger with a SPAC. Even though he had no formal role with the Company, Mathur participated in the meeting. *See* PX 13 at 1.

By late November 2020, the Company, Chicago Pacific, and Wasson were discussing a potential three-way merger involving the Company, MyCare, and a Wasson-sponsored SPAC (the "Original Deal Structure"). AC ¶ 32. To advance the discussions, the Company and Wasson exchanged signature pages by email for a mutual non-disclosure agreement on November 20, 2020. PXs 14–15. Even though he had no formal role with the Company, Mathur was copied on those emails. *See id.*

By December 2020, the Company, Chicago Pacific, and Wasson were ready to move forward with the Original Deal Structure. AC ¶ 32. Until this point, no one had shared the details of the proposed de-SPAC merger with Hudson, the Company's second largest investor. On December 29, Kazarian emailed an analysis of the Original Deal

6

Structure to Hudson. PX 17. Even though Mathur had no role with the Company, Kazarian copied him on the email. *See id.* at '521.

Hudson responded with comments on the Original Deal Structure. PX 18. The email was addressed to Mathur and three other Chicago Pacific principals. *Id.* at '161. The other three served on the Board. *Id.*

In early January 2021, the Chicago Pacific representatives on the Board formally proposed that the Company pursue a de-SPAC merger using the Original Deal Structure. Around the same time, Wasson formed a SPAC called Foresight Acquisition Corp. ("Foresight").

Because the Original Deal Structure contemplated a transaction between the Company and an affiliate of Chicago Pacific, the LLC Agreement required Hudson's consent before the Company could proceed. Believing that the economics of the Original Deal Structure were too generous to Chicago Pacific, Hudson withheld its consent.

## C.    The New Deal Structure

With the original deal blocked, Chicago Pacific, the Company, and Foresight began working on an alternative transaction structure. They decided to pursue a de-SPAC merger that only would involve the Company and Foresight (the "New Deal Structure"). By dropping MyCare from the deal, the New Deal Structure avoided the obvious trigger for Hudson's consent right.

As the Company pursued the New Deal Structure, Mathur continued to play a significant role. He led the negotiations between the Company and Foresight. *See* AC ¶ 46. He interacted with JPMorgan Chase & Co. ("JPMorgan"), the Company's financial

7

advisor, and Latham & Watkins LLP ("Latham"), the Company's legal advisor. *See* PXs 31 at '706, 69. Despite not having any role with the Company, he directed JPMorgan and Latham to perform specific tasks. *See* PXs 69, 118. He also insisted that before the Company could post any documents to a virtual data room for Foresight to review, they had to be reviewed by either Mathur or Kazarian. *See* PX 42 at '828.

In March 2021, despite not having any role with the Company, Mathur instructed Latham to prepare an analysis of Hudson's rights under the LLC Agreement and provide advice on how to move forward with the New Deal Structure in the face of objections from Hudson. AC ¶¶ 54, 65. Mathur contacted Latham proactively without any authority from the Board, and Latham followed his instructions without hesitation. *See* AC ¶ 65; Dkt. 77 Ex. 5 at 61–62. Mathur also provided JPMorgan and Latham with other lists of tasks to accomplish and topics to address. *See* AC ¶ 65; PX 69.

By late March 2021, Foresight, Chicago Pacific, and the Company were putting the finishing touches on a letter of intent. *See* AC ¶ 43. Despite not having any formal role with the Company, Mathur attended a Zoom meeting with the Company's officers, Latham, JPMorgan, and other Chicago Pacific principals to review and mark up the proposed letter of intent. PX 80 at '446.

After reaching agreement with Foresight on the letter of intent, the Company sent it to Hudson. When Hudson objected, Kazarian worked with the Company's Chief Legal Officer and Latham on how to recharacterize the transaction to avoid triggering Hudson's consent right. *See, e.g.*, PXs 103, 107–08. Mathur was involved in those discussions as well. *See* PX 106 at '814.

In the ensuing weeks, the Company, Chicago Pacific, and Foresight moved forward with the New Deal Structure. They excluded Hudson from the process, but they included Mathur. For example, Mathur worked on the capitalization table, the table of sources and uses of cash, and a table showing the waterfall of proceeds, and he used those documents to help plan the transaction. *See* PXs 115 at '998, 118. When the Company needed tax guidance, it was Mathur who contacted an accounting firm, then gave instructions to the Company's Chief Financial Officer. *See* PX 117 at '320–23. And it was Mathur and the Company's Chief Legal Officer who worked with Latham to analyze how various issues would affect the distribution of proceeds. *See* PX 118 at '984.

Mathur also ran point on the raising of additional capital through a private investment in public equity ("PIPE"). In April 2021, when the SPAC market declined, JPMorgan contacted Mathur about a lower target for the PIPE. *See* PX 116 at '401. Rather than discussing the issue with the Board, Mathur texted with two of the Chicago Pacific Managers. *See id.* They agreed on a PIPE of $300-350 million. *Id.*

As April 2021 unfolded, the SPAC market declined further, and the anticipated proceeds from the PIPE fell to $208 million. AC ¶¶ 31, 67. When Latham learned that the PIPE was shrinking, the attorneys contacted Mathur to understand the situation and its implications. *See* PX 118 at '985.

In early May 2021, JPMorgan reported that the PIPE could be as low as $140 million. AC ¶ 70. When JPMorgan circulated an email about the reduction, a copy went to Mathur. Everyone else who received the email had a formal position at the Company, with its advisors, or with Foresight. *See* PX 127 at '743.

9

Mathur also played a significant role in implementing the "Up-C" structure for the merger. To implement that structure, the Company needed to enter into tax receivable agreements with its members. *See* PX 117 at '323–24. Latham's tax counsel worked with Mathur and the Company's senior officers to prepare the tax receivable agreements. *See* PX 120 at '191.

During that process, Latham sent a presentation to Foresight and its counsel that explained the New Deal Structure and the tax receivable agreements. *Id.* When Mathur received the email, he asked Latham to send him the current draft of the agreement. Latham responded that they would circulate the agreement that evening and pointed out that the Company's officers and Latham's tax experts had already reviewed it. *Id.*

That response was not acceptable to Mathur, and he let Latham know who was in charge:

> Not sure why we have a disconnect here. [Chicago Pacific] owns a majority of the Company and so we want to review ALL these docs in parallel. While I know you view [the Company's general counsel and its Chief Financial Officer] as your client, [Kazarian]/I should be part of this process as well.
>
> In short, I would advise that no docs go to Foresight/[Foresight's counsel] without [Chicago Pacific] sign off. . . .
>
> Also, what other drafts have you shared with the Company that . . . I have not seen yet.

PX 120 at '190. After a call with Mathur, Latham confirmed that they would not circulate any documents until they heard from him. *Id.*

**D.    The Board Approves The Merger.**

On May 20, 2021, the Company noticed two meetings at which the Board would consider the de-SPAC merger between the Company and Foresight. The first meeting was scheduled for the next day, on May 21. The second meeting was scheduled for two days after that, on May 23. AC ¶ 77. The plan was to vote on the merger on May 23. Mathur was not a member of the Board, yet he was invited to the meetings. PX 136 at '452–533.

After the first meeting, the Company's Chief Legal Officer circulated updated transaction documents. *See* PX 141 at '786. Mathur received a set. *Id.*

Because Hudson raised objections to the transaction, the Board scheduled an additional meeting for 7:00 a.m. on May 25, 2021. PX 136 at '786. Mathur was invited to this meeting as well. *Id.* During this meeting, a majority of the Board approved the merger. The Hudson Managers abstained. AC ¶ 82.

**E.    This Litigation**

On June 11, 2021, Hudson filed this lawsuit and sought a preliminary injunction against the merger. The parties conducted expedited discovery, and Hudson submitted its preliminary injunction application.

On September 14, 2021, the court denied Hudson's request for a preliminary injunction. The court held that Hudson had failed to show a reasonable likelihood of success on any claim that could not be addressed after the closing of the merger. As a result, Hudson had failed to make the showing of irreparable harm necessary to support an injunction. *See* Dkt. 121 at 34.

11

On December 3, 2021, the merger closed. Hudson then filed the currently operative complaint.

Count XI of the complaint asserts that Mathur tortiously interfered with Hudson's rights under the LLC Agreement. According to the complaint, Mathur either induced or otherwise caused Chicago Pacific and the Company not to comply with the LLC Agreement. AC ¶¶ 165–67.

## II.     LEGAL ANALYSIS

Mathur has moved for dismissal under Rule 12(b)(2) for lack of personal jurisdiction. "When a defendant moves to dismiss a complaint pursuant to Court of Chancery Rule 12(b)(2), the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant." *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007).

Under Delaware law, the exercise of personal jurisdiction has two requirements. *Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012). First, the plaintiff must identify a valid method of serving process. Second, the exercise of personal jurisdiction must rely on sufficient minimum contacts between the defendant and Delaware such that the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice." *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

## A.     Service Of Process

As a method of serving process, Hudson relies on Section 18-109(a) of the LLC Act. In relevant part, it states:

A manager . . . may be served with process in the manner prescribed in this section in all civil actions or proceedings brought in the State of Delaware involving or relating to the business of the limited liability company or a violation by the manager . . . of a duty to the limited liability company or any member of the limited liability company, whether or not the manager . . . is a manager . . . at the time suit is commenced.

A manager's . . . serving as such constitutes such person's consent to the appointment of the registered agent of the limited liability company (or, if there is none, the Secretary of State) as such person's agent upon whom service of process may be made as provided in this section.

6 *Del. C.* § 18-109(a) (formatting added).[2]

Like other entity statutes that authorize service of process on members of the governing body of an entity or its officers, Section 18-109(a) solely provides a basis for specific jurisdiction, not general jurisdiction. *See Total Hldgs. USA, Inc. v. Curran Composites, Inc.*, 999 A.2d 873, 885 n.39 (Del. Ch. 2009). The claim against the manager must therefore "involv[e] or relat[e] to the business of the limited liability company or a

---

[2] In the alternative, Hudson argues that Mathur is subject to service of process under Delaware's Long-Arm Statute because he played a significant role in the de-SPAC merger, and that transaction involved a jurisdictional act in Delaware that took the form of filing a certificate of merger with the Delaware Secretary of State. *See* 8 *Del. C.* § 3104(c); *see also Hercules Inc. v. Leu Tr. & Banking (Bahamas) Ltd.*, 611 A.2d 476, 480 (Del. 1992) (Section 3104(c) "is to be broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause"); *Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1995 WL 694397, at *10 (Del. Ch. Nov. 21, 1995) (same). The court analyzed a similar jurisdictional theory when rejecting Wasson's argument that the court could not exercise personal jurisdiction over him. *See In re P3 Health Gp. Hldgs., LLC*, 2022 WL 8011513 (Del. Ch. Oct. 14, 2022). The same jurisdictional theory applies to Mathur. Although Wasson engaged in additional jurisdictional acts in the State of Delaware because he formed two Delaware entities in connection with the de-SPAC merger, the filing of the certificate of merger with the Delaware Secretary of State is a sufficient jurisdictional act. *Id.* at *4–5. Section 3104(c) thus provides an alternative means of serving Mathur.

violation by the manager . . . of a duty to the limited liability company or any member of the limited liability company." 6 *Del. C.* § 18-109(a). Mathur does not dispute that aspect of the analysis.

Section 18-109(a) defines the term "manager" to include both formal managers and acting managers. It states:

> As used in this subsection (a) and in subsections (b), (c) and (d) of this section, the term "manager" refers
>
> (i) to a person who is a manager as defined in § 18-101(10) of this title and
>
> (ii) to a person, whether or not a member of a limited liability company, who, although not a manager as defined in § 18-101(10) of this title, participates materially in the management of the limited liability company;
>
> provided however, that the power to elect or otherwise select or to participate in the election or selection of a person to be a manager as defined in § 18-101(10) of this title shall not, by itself, constitute participation in the management of the limited liability company.

6 *Del. C.* § 18-109(a) (formatting added); *accord id.* § 18-110(c) (using same definition). The two-part definition references Section 18-101(10), which defines a "manager" as "a person who is named as a manager of a limited liability company in, or designated as a manager of a limited liability company pursuant to, a limited liability company agreement or similar instrument under which the limited liability company is formed." *Id.* § 18-101(10).

The first category of persons identified in Section 18-109(a)—formal managers—encompasses persons who qualify as managers under Section 18-101(10) because they have been officially named as managers in or designated pursuant to the entity's governing documents. The second category of persons—acting managers—encompasses

14

other persons, not formally named as managers under Section 18-101(10), who nevertheless participate materially in the management of the limited liability company.

Hudson contends that Mathur was an acting manager under Section 18-109(a)(ii). Hudson does not claim that Mathur was a formal manager under Section 18-109(a)(i).

### 1. Participating Materially In The Management Of The Company

Under Section 109(a)(ii), a defendant who participated materially in the management of the limited liability company can be served as an acting manager. Based on dictionary definitions, "[t]he plain meaning of the word 'participate' involves taking part in or playing a role in an activity or event." *Metro Storage Int'l LLC v. Harron*, 2019 WL 3282613, at *8 (Del. Ch. July 19, 2019) (citing definitions). "When modifying the word 'participate,' the word 'materially' introduces a level of significance. It requires meaningful participation, rather than minor participation." *Id.* (same). The plain language of Section 18-109(a)(ii) thus confers the status of an acting manager on an individual who has a significant role in managing an LLC or who plays a significant part in an activity or event that constitutes part of the management of the LLC.

Taken as a whole, Mathur's actions easily clear the bar for playing a significant role in the Company's management. Mathur was a central player in the year-long transaction process that led to the de-SPAC merger. He participated in the initial evaluation of a de-SPAC merger and attended the Board meeting at which the concept was vetted. *See* PXs 8 at '152, 13 at 1. He participated in the discussions with Hudson about the Original Deal Structure. *See* PXs 17–18. After Hudson withheld its consent, Mathur led the negotiations with Foresight over the letter of intent for the New Deal

Structure. *See* AC ¶ 46. He interacted with JPMorgan and Latham, instructed them to perform specific tasks, and insisted that either he or Kazarian sign off on each document that Latham posted to the virtual data room. *See* AC ¶¶ 54, 65; PXs 31 at '706, 42 at '828, 69, 118; Dkt. 77 Ex. 5 at 61–62. Once the letter of intent with Foresight was complete, he participated in the effort to recharacterize the transaction in a manner that would avoid triggering Hudson's consent right. *See* PX 106 at '814. He also worked on other aspects of the transaction, such as the sources and uses of funds, the distribution waterfall, and the proper tax treatment. *See* PXs 115 at '998, 117 at '320–23, 118. He ran point on the PIPE. *See* PX 116 at '401. When Latham learned the PIPE was shrinking, the attorneys contacted Mathur to understand the situation and its implications. *See* PX 118 at '985; *see also* PX 127 at '743. And Mathur played a significant role in implementing the "Up-C" structure for the merger, where he worked with Latham's tax counsel to design and implement the tax receivable agreements. *See* PXs 117 at '323–24, 120 at '191.

During the work on the Up-C structure, Mathur made clear that he was making decisions on behalf of the Company. When Mathur learned that Latham planned to circulate the draft tax sharing agreement without his signoff, he sent a pointed email about who was in charge:

> Not sure why we have a disconnect here. [Chicago Pacific] owns a majority of the Company and so we want to review ALL these docs in parallel. While I know you view [the Company's general counsel and its Chief Financial Officer] as your client, [Kazarian]/I should be part of this process as well.

16

> In short, I would advise that no docs go to Foresight/[Foresight's counsel] without [Chicago Pacific] sign off. . . .

PX 120 at '190. Latham got the message and told Mathur that they would not circulate any documents until they heard from him. *Id.*

To negate the straightforward inference that he participated in the management of the Company, Mathur argues that "a far deeper involvement in management . . . is necessary to confer jurisdiction under Section 18-109(a)." Dkt. 153 at 32. He relies on *Dlayal Holdings, Inc. v. Al-Bawardi*, 2021 WL 6121724 (Del. Ch. Dec. 27, 2021), which concerned an LLC (Oasis) that was a wholly owned subsidiary of a real estate holding and management company. 2021 WL 6121724, at *2. There the third-party defendant (Gracey) was the day-to-day manager of two ranches in Oasis's portfolio. *Id.* At no point did he serve as a formal manager of either Oasis or its parent company. *Id.* Gracey's duties included entering into contracts necessary for managing the ranches, but his authority to enter contracts was limited. Gracey was not authorized to sell or permanently encumber the ranches. *Id.* Oasis held other assets, so it was not possible to infer at the pleading stage that managing the assets of the entity was the functional equivalent of managing the entity itself. *See id.* at *8. The court declined to infer that Gracey was an acting manager of Oasis who was subject to personal jurisdiction in Delaware. *Id.* at *6.

The complaint in this case paints a different picture. Mathur was one of the principals of Chicago Pacific, the controlling member of the Company. Mathur explained the significance of his role when he told Latham "[Chicago Pacific] owns a majority of the Company and so we want to review ALL these docs in parallel . . . no docs go to

17

Foresight/[Foresight's counsel] without [Chicago Pacific] sign off." PX 120 at '190. The complaint alleges that Mathur was the primary negotiator for the Company, and he had greater access to information than other members of the Board, such as Hudson's appointees. AC ¶¶ 17, 46. Mathur's authority was not circumscribed or limited like Gracey's. The situation was reversed, with Mathur instructing the Company's formal representatives.

Mathur also relies on *In re Arctic Ease, LLC*, 2016 WL 7174668 (Del. Ch. Dec. 27, 2021). There, the plaintiffs argued that the defendant (Cohen) participated materially in the management of an LLC (Summetria) because he negotiated a distribution agreement on behalf of Summetria's subsidiary. *Id.* at *3–4. This court declined to exercise personal jurisdiction over Cohen because the governing LLC agreement designated a "sole manager" of the entity, holding that it was impossible for Cohen to effectively control the entity in the facts of that decision. *Id.* at *3. In reaching this result, the *Arctic Ease* decision applied what this court has described as the "control overlay test." *See Harron*, 2019 WL 3282613, at *17–20.[3] The *Harron* decision analyzed the control overlay test and explained why it conflicts with the plain language of Section 18-109(a). That analysis remains pertinent here and undercuts the persuasiveness of *Arctic*

---

[3] In addition to *Arctic Ease*, the cases in this line of authority include: *Wakley Ltd. v. Ensotran, LLC*, 2014 WL1116968 (D. Del. Mar. 18, 2014); *CelestialRX Invs., LLC v. Krivulka*, 2019 WL 1396764 (Del. Ch. Mar. 27, 2019); *Florida R & D Fund Invs., LLC v. Florida BOCA/Deerfield R & D Invs., LLC*, 2013 WL 4734834 (Del. Ch. Aug. 30, 2013).

*Ease*. Mathur has not meaningfully distinguished the analysis in *Harron*, which this decision will not repeat.

Given this record, it is reasonable to infer that Mathur participated significantly in directing and carrying out the Company's strategy with respect to the de-SPAC merger. At the pleading stage, that is sufficient to support an inference that Mathur qualifies as an acting manager for purposes of a Rule 12(b)(2) motion.

### 2. The Absence Of Any Official Role

In arguing against the exercise of personal jurisdiction under Section 18-109(a)(ii), Mathur stresses that he lacked any official position at the Company. *See* Dkt. 153 at 32. Several decisions upholding the service of process on acting managers have involved officers or employees,[4] but it is not necessary for a defendant to have a formal role or title with the LLC to qualify as an acting manager. *See* Robert L. Symonds, Jr. & Matthew J. O'Toole, *Symonds & O'Toole on Delaware Limited Liability Companies* § 9.13[A][1] (2d ed. & Supp. 2019).

Two decisions have reached this conclusion for purposes of exercising personal jurisdiction under Section 18-109(a). In the first decision, three Delaware LLCs challenged the validity of charging orders entered against them and in favor of two creditors. *Am. Institutional P'rs, LLC v. Fairstar Res. Ltd.*, 2011 WL 1230074, at *2 (D.

---

[4] *See, e.g.*, *Metro Storage*, 2019 WL 3282613, at *11; *Phillips v. Hove*, 2011 WL 4404034, at *22 (Del. Ch. Sept. 22, 2011); *PT China LLC v. PT Korea LLC*, 2010 WL 761145, at *5 & n.25 (Del. Ch. Feb. 26, 2010).

Del. Mar. 31, 2011). The plaintiffs sought to serve the creditors under Section 18-109(a), contending that they had purported to take action on behalf of the Delaware LLCs by (i) instructing the LLCs' former counsel to turn over their litigation files and (ii) making filings in lawsuits in Utah on behalf of the LLCs. *Id.* at *7. The creditors never held any positions with the LLCs, whether as formal managers, officers, or employees. Judge Leonard Stark held that "Defendants' alleged assertion of managerial interests is sufficient to justify haling Defendants into a Delaware court, as Plaintiffs have established with reasonable particularity that Defendants materially participated in management of the Subject LLCs, making personal jurisdiction proper under the Implied Consent Statute." *Id.*

This court reached a similar conclusion in *Feeley v. NHAOCG, LLC*, 2012 WL 966944 (Del. Ch. Mar. 20, 2012). A New York limited liability company (NHA) held a 50% member interest in a Delaware LLC (Oculus). The latter was a manager-managed LLC, and its LLC agreement named another Delaware LLC as its formal manager. The human controller of the latter LLC (Feeley) served as President of Oculus. After disputes arose between the principals of NHA and Feeley, NHA purported to act on behalf of Oculus to terminate Feeley from his position as President. NHA then purported to assume the role of managing member of Oculus and informed Oculus's clients that it had taken over that role. *Id.* at *3–4. When Feeley and his entity sued NHA for breach of fiduciary duty in this court, NHA claimed it was not subject to personal jurisdiction because it never had a formal role with Oculus and only exercised rights it held as member under Oculus's operating agreement. The court rejected that argument:

20

The complaint alleges that NHA participated materially in the management of Oculus by taking actions that fell within the exclusive authority of the Managing Member under the Oculus LLC Agreement. Confronted with this litigation and the jurisdictional reach of Section 18–109(a), NHA now argues that it merely exercised a "power to elect or otherwise select or to participate in the election or selection of a person to be a manager." If NHA had asserted in a straightforward manner its right to remove Ak–Feel under Section 4.7 of the Oculus LLC Agreement, then NHA justifiably could assert that it did not participate in the management of Oculus by doing so. Of course, NHA did much more than invoke its right to remove Ak–Feel under Section 4.7. NHA purported to act on behalf of Oculus to "non-renew" Feeley's employment agreement. NHA simultaneously purported to retain Feeley as an Oculus officer. NHA later purported to act on behalf of Oculus to terminate Feeley from his position as officer. The plain language of the Oculus LLC Agreement confers exclusive authority to take these actions on the Managing Member. NHA also communicated directly with Oculus clients and asserted that NHA in fact was acting as Oculus's Managing Member. These actions satisfy the requirements of Section 18–109(a).

*Id.* at \*7. It did not matter that NHA did not have any formal role with Oculus. The fact that NHA purported to cause Oculus to act was sufficient to support the exercise of personal jurisdiction over NHA for purposes of claims relating to those acts.

Outside of the Section 18-109 context, this court has recognized that a party does not have to hold an official title or position with an LLC to be treated as a manager. The leading decision is *WaveDivision Holdings., LLC v. Millennium Digital Media Systems, L.L.C.*, 2010 WL 3706624 (Del. Ch. Sept. 17, 2010). Writing as a member of this court, Chief Justice Strine found that an individual (Fredette) who was not a formal manager, officer, or employee of an LLC nevertheless acted as a manager of the LLC and owed fiduciary duties in that capacity. Millennium had a formal manager who ran its day-to-day operations and reported to a six-member management committee. A private equity fund appointed two of the six members of the management committee. Millennium

21

entered into an agreement to sell its assets to a third party (WaveDivision), but the private equity fund caused Fredette to solicit Millennium's creditors to reject the deal. When WaveDivision sued Millennium and alleged that Fredette's actions breached the asset purchase agreement, Millennium argued that Fredette had no authority to act on its behalf. Chief Justice Strine held that even though Fredette had no official title at Millennium, he "was empowered as a de facto manager," pointing out that Fredette "enjoyed unfettered access to Millennium's confidential information, helped plan Millennium's responses to various outside parties on important issues, and co-presented with [a formal manager] during Millennium's updates to its lenders." *Id.* at *3.

This court reached a similar conclusion in *Triple H Family L.P. v. Neal*, 2018 WL 3650242 (Del. Ch. July 31, 2018). The counterclaim-defendant (Hoops) directed counsel to set up an entity (Omni), instructed the Chief Financial Officer of one of his other businesses to perform work on behalf of Omni, and made staffing decisions on behalf of Omni. *Id.* at *14. When his former business partner sued him for breaching his fiduciary duties as a manager of Omni, Hoops argued that he could not be a manager because the governing LLC agreement designated a different individual as "President and CEO." *Id.* The court rejected this argument, holding that the LLC agreement's reference to a different individual being the formal manager did not preclude Hoops from also being a manager of the LLC, "de facto or otherwise." *Id.* at *15. The court ruled that the complaint's allegations were sufficient to support a pleading-stage inference that Hoops acted as a de facto manager, explaining that he was significantly "involved in, and had sufficient control over, the management of Omni to consider him a de facto manager." *Id.*

22

From a legal standpoint, these decisions show that a defendant need not have an official role with an LLC before a plaintiff can serve the defendant as an acting manager under Section 18-109(a)(ii) or proceed against the defendant as a de facto manager on the merits. From a factual standpoint, the cases show that the complaint's allegations are sufficient to support the exercise of jurisdiction over Mathur as an acting manager.

Mathur's actions exceeded the level of authority held by the creditors in *Fairstar* and the minority member in *Feeley*. Neither had any official role the entities or any basis to claim the authority to act as they did. In both cases, the courts exercised jurisdiction over them because they purported to act on behalf of the LLCs.

Mathur's authority compares favorably to the level of authority exercised by Fredette in *WaveDivision*. Like Fredette, Mathur acted on behalf of the fund that controlled the entity, had virtually unlimited access to the Company's confidential information, and gave instructions to the Company's outside advisors. To a greater degree than Fredette, Mathur made decisions on behalf of the Company.

Mathur's actions also compare favorably with the level of control displayed in *Triple H*. Mathur's own email to Latham demonstrates his control, because he flatly told Latham—the Company's counsel—that no documents should go to Foresight without his review. PX 120 at '190. Mathur also gave instructions to the Company's Chief Financial Officer regarding tax issues and to its outside advisors regarding actions they should take and analyses to prepare. *See, e.g.*, PXs 116 at '401, 117 at '320–23.

There is nothing surprising about a court of equity exercising jurisdiction based on the actual facts rather than the formality of titles. "It is the very nature of equity to look

23

beyond form to the substance of an arrangement." *Gatz v. Ponsoldt*, 925 A.2d 1265, 1280 (Del. 2007). As these decisions show, there is no requirement that an acting manager have an official title or role with an LLC to be treated as an acting manager for purposes of service of process or as a de facto manager for purposes of the merits. The fact that a defendant holds a formal role or title with an LLC, such as a position as an officer or employee, may contribute to a finding that the defendant was an acting manager or a de facto manager, but an official role or title is not necessary. In this case, Mathur's actions rise to the level of the status of an acting manager, and his own words confirm it.

## B. Due Process

Once a plaintiff has identified a valid method of serving process, the court must assess "whether [the defendant] engaged in sufficient minimum contacts with Delaware to require it to defend itself in the courts of this State consistent with the traditional notions of fair play and justice." *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 440 (Del. 2005) (internal quotation marks omitted). In addition to the defendant's contacts with the state, relevant factors include "the forum State's interest in adjudicating the dispute; the plaintiff's interest in obtaining convenient and effective relief . . . ; [and] the interstate judicial system's interest in obtaining the most efficient resolution of controversies . . . ." *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 220 (Del. 1982) (citations omitted) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)).

"Delaware has a strong interest in providing a forum for disputes relating to the ability of managers of an LLC formed under its law to properly discharge their respective

managerial functions." *Assist Stock Mgmt. L.L.C., v. Rosheim*, 753 A.2d 974, 981 (Del. Ch. 2000); *see In re Silver Leaf, L.L.C.*, 2004 WL 1517127, *3 (Del. Ch. June 29, 2004) ("Delaware has a strong interest in resolving disputes regarding the internal affairs of LLCs formed under its laws." (cleaned up)). A person who takes on a managerial role has implicitly consented to being sued in a Delaware court to adjudicate disputes that are intertwined with that role. *See Feeley*, 2012 WL 966944, at *7; *PT China*, 2010 WL 761145, at *5, *8 n.44. Due process is satisfied as long as (i) the allegations against the defendant-manager focus centrally on the defendant's rights, duties and obligations as a manager of a Delaware LLC, and (ii) the resolution of the matter will be inextricably bound up in Delaware law. *Assist Stock Mgmt.*, 753 A.2d at 982.

When Mathur involved himself in the planning, negotiation, and execution of the merger, he took actions on behalf of the Company that were akin to what formal mangers would do. By doing so, he subjected himself to suit in the courts of Delaware for claims relating to his actions. Mathur necessarily understood that a Delaware court would be a proper forum for a lawsuit addressing the actions he took. Hudson is not attempting to sue Mathur in some far-off jurisdiction with an at-best tangential relationship to the dispute. Hudson has sued Mathur in the courts of the jurisdiction that gave life to the Company, whose law will govern the dispute, and which has a powerful interest in providing a forum for adjudicating litigation involving its entity citizens. Due process is satisfied.

### III.    CONCLUSION

Mathur is subject to personal jurisdiction in Delaware for purposes of the claim

asserted in this case. His motion to dismiss this action pursuant to Rule 12(b)(2) is denied.